RECORD NO. 15-1031

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

S.T.; S.J.P.T.; I.T.,

*Plaintiffs - Appellants,*

v.

# HOWARD COUNTY PUBLIC SCHOOL SYSTEM;
# RENEE A. FOOSE, officially,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

THE HONORABLE J. FREDERICK MOTZ, PRESIDING

## OPENING BRIEF OF APPELLANTS

Wayne D. Steedman
CALLEGARY & STEEDMAN, P.A.
201 North Charles Street, Suite 1402
Baltimore, MD 21201
(410) 576-7606
wayne@callegarysteedman.com

James F. Silver
CALLEGARY & STEEDMAN, P.A.
201 North Charles Street, Suite 1402
Baltimore, MD 21201
(410) 576-7606
James@callegarysteedman.com

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1031__        Caption: __S.T. et al. v. Howard County Public School System__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__S.T., S.J.P.T. and I.T.__
(name of party/amicus)

_____

who is _____appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: 1/29/2015

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
****************************

I certify that on ___January 29, 2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    1/29/2015
(signature)                  (date)

- 2 -

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................2

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS .......................................................................4

SUMMARY OF ARGUMENTS ..............................................................8

ARGUMENTS .........................................................................................9

     A.    STANDARD OF REVIEW ..................................................9

     B.    IT IS A DENIAL OF FAPE FOR A SCHOOL SYSTEM TO OFFER AN EDUCATIONAL PLACEMENT THAT CANNOT IMPLEMENT THE IEP AT THE TIME THE IEP IS WRITTEN ..................................................................10

     C.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN CONSIDERING RETROSPECTIVE EVIDENCE REGARDING THE EDUCATIONAL PLACEMENT OFFERED TO S.T. ..................................................................13

     D.    PARENTAL INVOLVEMENT IN THE IEP PROCESS IS ABROGATED IF THE SCHOOL SYSTEM IS PERMITTED TO CHANGE THE EDUCATIONAL PROGRAM AFTER THE IEP HAS BEEN CREATED ......................................16

     E.    THE DISTRICT COURT ERRED AS A MATTER OF LAW BY INCLUDING BRIDGE SERVICES IN ITS DETERMINATION THAT APPELLEES HAD OFFERED S.T. A FAPE..........................................................................20

i

F.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT THE APPELLEES HAD NOT YET FAILED TO PROVID3E S.T. A FAPE.............................................24

   1.    The holding that the Appellants' due process complaint was premature ignores the Parents' right to challenge the educational placement identified by the IEP team ...................24

   2.    The holding that the Appellants' due process complaint was premature denies parents the right to rely on the school system's description of the proposed educational placement ................................................................................25

   3.    The holding that the Appellants' due process complaint was premature denies the Parents the right to maintain S.T. at his current educational placement .................................26

   4.    Holding an IEP meeting at a later time to discuss extended school year services does not cure the deficiencies in the identified educational placement ...............27

CONCLUSION ....................................................................................31

REQUEST FOR ORAL ARGUMENT .................................................32

CERTIFICATE OF COMPLIANCE....................................................33

CERTIFICATE OF SERVICE .............................................................34

## TABLE OF AUTHORITIES

## CASES

<u>Page</u>

*Adams v. Oregon*,
   195 F.3d 1141 (9th Cir.1999) ........................................................................13

*A.K. ex rel. J.K. v. Alexandria City School*,
   484 F.3d 672 (4th Cir.2007) ...................................................................*passim*

*Avjian v. Weast*,
   242 Fed. Appx. 77 at 81..............................................................................14

*Burlington Sch. Committee v. Mass. Dept. of Edu.*,
   471 U.S. 359 (1985)..............................................................10, 16, 20, 27

*Consolidated Coal Co. v. Local 1643, United Mine Workers of America*,
   48 F.3d 125 (4th Cir, 1995) ..........................................................................10

*County Bd. of Henrico v. ZP ex rel. RP*,
   300 F.3d 298 (4th Cir. 2005) .....................................................................9, 10

*DC ex rel. EB v. New York City Department of Edu.*,
   950 F. Supp. 2d 494 (S.D.N.Y. 2013) ..........................................................12

*Deal v. Hamilton Bounty Board of Edu.*,
   392 F.3d 840 (6th Cir. 2004) ........................................................................17

*DiBuo ex rel. DiBuo v. Board of Edu.*,
   309 F.3d  184 (4th Cir. 2002)....................................................................9, 10

*Forest Grove Sch. District v. T.A.*,
   129 S. Ct. 2484 (2009).................................................................................20

*Fuhrmann v. East Hanover Board of Edu.*,
   993 F.2d 1031 (3rd Cir. 1993) .....................................................................13

*Gadsby by Gadsby v. Grasmick*,
   109 F.3d 940 (4th, Cir. 1997 .........................................................................9

iii

*Glendale Unified Sch. District v. Almasi*,
  122 F. Supp. 2d 1093 (C.D.Cal. 2000) ............................................................12

*Higgins v. E.I. DuPont de Nemours & Co.*,
  863F.2d 1162 (4th Cir. 1988) ..........................................................................9

*Jenna R.P. v. City of Chicago Sch. District No. 229*,
  3NE 3d 927 (Ill. App. 1st Div. 2013) ............................................................22

*Justin G. v. Board of Edu. Of Montgomery Co.*,
  148 F. Supp. 2d 576 (D. Md 2001)..................................................................30

*Kirkpatrick v. Lenoir County Board of Edu.*,
  216 F.3d 380 (4th Cir. 2000) ...........................................................................9

*RE v. New York City Dept. of Edu.*,
  694 F.3d 167 (2d Cir. 2012) ...............................................................18, 20, 26

*Reusch v. Fountain*,
  872 F. Supp. 1421 (D. Md. 1994)......................................................28, 29, 30

*Reyes v. New York City Dept. of Edu.*,
  760 F.3d 211 (2nd Cir. 2014) ..................................................................25, 26

*Roland M. v. Concord Sch. Committee*,
  910 F.2d 983 (1st Cir. 1990)...........................................................................13

*Schaffer ex rel. Schaffer v. Weast*,
  554 F.3d 470 (4th Cir. 2009) ................................................................13, 15, 25

*Schaffer v. Weast*,
  546 U.S. 49 (2005)....................................................................6, 10, 16, 18, 23

*Spielberg v. Henrico County Public Sch.*,
  853 F.2d 256 (4th Cir. 1988) .........................................................................17

*V.S. v. New York City Dept. of Edu.*,
  25 F. Supp. 3d 295 (E.D. N.Y., 2014) .......................................................19, 20

iv

*Wagner v. Board of Edu. of Montgomery Co.*,
   355 F.3d 297 (4th Cir. 2003) ...........................................................10

*W.G. v. Board of Trustees of Target Range Sch. District No. 23*,
   960 F.2d 1479 (9th Cir. 1992) .......................................................17

## STATUTES AND REGULATIONS

20 U.S.C. § 1343 ..............................................................................1
20 U.S.C. § 1400 *et seq*...................................................................1
20 U.S.C. § 1400(c)(5)(B) (2006) ....................................................17
20 U.S.C. § 1401(9) .........................................................................10
20 U.S.C. § 1401(19) .........................................................................1
20 U.S.C. § 1412(a)(1)(A) ...............................................................10
20 U.S.C. § 1414(d) .........................................................................11
20 U.S.C. § 1414(d)(1)(A)(i)(VII) ..................................................11
20 U.S.C. § 1415(b)(6).....................................................................24
20 U.S.C. § 1415(f)(3)(E)(ii)(II) ................................................17, 19
20 U.S.C. § 1415(j) ......................................................................6, 26
28 U.S.C. § 1297 ................................................................................1
28 U.S.C. § 1331(a) ...........................................................................1

34 C.F.R. § 300.106(a)......................................................................28
34 C.F.R. § 300.106(b)......................................................................28
34 C.F.R. § 300.116(b)(2).................................................................30
34 C.F.R. § 300.320 ..........................................................................11
34 C.F.R. § 300.320(a)(7) .................................................................11

COMAR 13A.05.01.09A(2) ..............................................................28

## RULES

Local Rule 25(c)..................................................................................1

## OTHER AUTHORITIES

MARYLAND STATE DEPARTMENT OF EDUCATION, TECHNICAL
   ASSISTANCE BULLETIN No. 5, *Extended School Year Services* (*Revised
   July, 2003*) ...............................................................................29, 30

## STATEMENT OF JURISDICTION

Appellant, S.T. is a child diagnosed with autism who at the time this lawsuit was filed was seven years old and is a disabled student as that term is defined by the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. §1400 *et seq.* JA II at 184.[1] Appellants, S.J.P.T. and I.T. are the parents of S.T.  S.T. resides in Howard County, Maryland with his parents.  As a child with a disability, S.T. is entitled to special education and related services pursuant to the IDEA. Appellees, Howard County Public School System (hereinafter "HCPSS" or "the school system") is a local education agency as defined by the IDEA. 20 U.S.C. §1401(19). Renee A. Foose is the Superintendent of Schools for HCPSS.  S.T. and his parents brought a civil action in the District Court of Maryland, JA I at 10, to review the decision of an Administrative Law Judge (ALJ) finding that HCPSS had offered a free appropriate public education (FAPE) as required by the IDEA.  JA II at 241.

The district court had jurisdiction over the federal claims pursuant to the IDEA and 28 U.S.C. §§ 1331(a) and 1343.  The district court also had jurisdiction over pendent state claims pursuant to 28 U.S.C. § 1297.  This appeal is from the final order of the district court entered on January 5, 2015, that disposed of all

---

[1] The Joint Appendix is in two volumes, I and II.  JA I refers to volume I and JA II refers to volume II. Volume II is sealed as it contains confidential information regarding S.T., a minor child and his parents per Local Rule 25(c).

parties' claims.  JA I at 84.  An appeal was timely filed on January 6, 2015.  JA I at

85.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. May a school system force the parents of a child with a disability to accept a placement that cannot implement the child's IEP at the time the IEP is written?

2. Do the IDEA's parental notice requirements permit a school system to use evidence at a Due Process Hearing that was not available to the parents at the time of the IEP meeting?

3. Does the IDEA permit a school system to change the educational program it offered at the IEP meeting, and which the child's parents relied upon in making their decision, to a different type of educational program during the course of the Due Process Hearing?

## STATEMENT OF THE CASE

S.T is a nine year boy who has been identified as a child with autism

spectrum disorder.  As such he is eligible for special education and related

services.  HCPSS had provided an individualized education program (IEP) for S.T.

through his entire education.  An IEP must be reviewed and revised annually.

During the annual review of S.T.'s IEP on October 21, 2013, HCPSS proposed to

move S.T. from his then current private school, the Trellis School in Hunt Valley,

Maryland, to a public school, the Cornerstone program located at Cedar Lane

School in Howard County, Maryland.  S.T.'s parents rejected this proposed change

in part because it would have been the fourth school S.T. would have attended in less than one year and because the Cornerstone program, being in session for 36 weeks, could not provide the 46 weeks of special education instruction and related services of speech/language therapy and occupational therapy required to fully implement the IEP. S.T.'s parents filed a due process hearing complaint and invoked "stay-put" to maintain S.T.'s placement at Trellis-Hunt Valley, during the pendency of the proceedings.

A due process hearing was held over five non-consecutive days starting January 9 and ending February 6, 2014. The ALJ issued her final decision on March 4, 2014, finding that the Cornerstone program could provide S.T. a free appropriate public education and denied the parents' request for continued funding for Trellis-Hunt Valley.

The parents filed a civil complaint in the district court challenging the ALJ's decision. The parties filed cross motions for summary judgment. The parents' argument centered on the fact that at the time the IEP was developed, Cornerstone could provide services for only 36 weeks and the IEP called for 46 weeks of services. During the due process hearing, HCPSS offered testimony that the length of the Cornerstone program had since been increased to 41 weeks and that they could possibly provide "bridge services" to cover the additional five weeks the IEP

3

required.  The parents argued that the law requires that the appropriateness of the IEP and placement must be reviewed in the context of the time it was created and that the ALJ erred in considering the "retrospective evidence" presented by HCPSS at the hearing in determining the appropriateness of the Cornerstone placement. The parents also argued that no reference to bridge services was included in the IEP and HCPSS had never described what bridge services could be provided to S.T.   The district court rejected the parents' arguments and denied their motion for summary judgment and granted HCPSS' motion for summary judgment.

## STATEMENT OF FACTS

During the fall of the 2012-2013 school year, HCPSS realized that S.T. was not making progress in his placement at Ilchester Elementary School. JA II at 249, ¶ 7. A Central Education Placement Team (CEPT) met in January, 2013, and decided to move S.T. to the Trellis School.  JA II at 249, ¶ 19. The Trellis School is a private school for children on the autism spectrum.   At the time of S.T.'s move to Trellis, HCPSS and the Trellis School had a partnership wherein a satellite Trellis program was located in the Cedar Lane School, an HCPSS school. JA II at 249-50, ¶20.  S.T. entered Trellis-Cedar Lane in February, 2013. JA II at 250, ¶ 22. Sometime during the Spring of 2013, HCPSS decided to terminate its partnership with Trellis and replace it with a new public program called Cornerstone. JA II at

4

250, ¶ 27. On June 12, 2013, the CEPT reconvened and decided that S.T. would

continue to attend the Trellis- Cedar Lane program through August 2, 2013, and

then attend the Trellis School main campus located in Hunt Valley, Maryland

(Trellis-Hunt Valley) starting in August, 2013. JA II at 168. The CEPT considered

the new Cornerstone program as a possible placement but determined it was not

appropriate for S.T. *Id.*

On October 21, 2013, after S.T. had been at Trellis-Hunt Valley less than

two months, HCPSS conducted an annual review of S.T.'s IEP. JA II at 224.  A

new IEP was developed and generally approved by the parties except for the

educational placement.  Janet Zimmerman, an HCPSS representative, chaired the

meeting and decided that S.T. should be transferred to the Cornerstone program.

She set December 2, 2013, as the date of the transfer. JA II at 226.  S.T.'s mother

expressed concerns about S.T. having to make another transition.[2]  JA II at 332, ¶

10-24.  Additionally, the IEP required 46 weeks (12 months)[3] of special education

and related services, i.e., speech/language therapy and occupational therapy. JA II

---

[2] It would have been the fourth school for S.T. in less than a year.  He
moved from Ilchester Elementary School to Trellis-Cedar Lane on February 5,
2013, JA II at 250, ¶ 22, and from Trellis-Cedar Lane to Trellis-Hunt Valley on
August 26, 2013.  JA II at 251, ¶ 28.

[3] 46 weeks of school is considered a year round/12 month school program
with breaks interspersed over the school year. JA II at 176-177.

at 220.  S.T.'s mother was aware that the proposed Cornerstone program could only provide 36 weeks of services because she had participated in the parent planning sessions as part of Cornerstone development process.  JA II at 383, ¶ 3-24 (testimony of  I.T.).  S.T.'s parents disagreed with Ms. Zimmerman's decision, and on November 26, 2013, filed a Due Process Complaint with the Maryland Office of Administrative Hearings. JA II at 232-237.  A preliminary hearing was held on December 13, 2013, before an administrative law judge (ALJ) to determine S.T.'s current educational placement or "stay put" placement during the pendency of litigation as stated in 20 U.S.C. §1415(j).  The ALJ determined that the Trellis School in Hunt Valley was S.T.'s stay put placement. JA II at 242.  HCPSS continued to fund S.T.'s placement at Trellis-Hunt Valley during the pendency of the due process hearing.

In January and February 2014, an ALJ from the Maryland Office of Administrative Hearings held a five-day due process hearing.  JA II at 242.  As the parties bringing the action, the parents had the burden of proof.  *Schaffer v. Weast,* 546 U.S. 49 (2005). On the first day of the hearing, January 9, 2014, the teacher from the Cornerstone program testified that Cornerstone was a 36-week/ten-month program with the possibility of extended school year services (ESY), which was described as four additional weeks of school.  JA II at 295, ¶ 9-17 (testimony of Ashley Grant ).  The parents concluded the presentation of their case at the end of

the third day of the hearing, January 31, 2014.  JA II at 334, ¶ 5-6.  On the fourth

day of the hearing, February 9, 2014, an HCPSS witness offered new testimony

that Cornerstone was an eleven-month program. JA II at 355 ¶ 11-12 (testimony of

Shannon Majoros[4]).  That same day, another HCPSS witness testified that HCPSS

also had the option to provide, what she termed, "bridge services."  JA II at 368-69

¶ 25-7 (testimony of Janet Zimmerman[5]).  Bridge services are not in S.T.'s IEP,

nor were they described by Ms. Zimmerman or any other witness. *Id.*  In her

March 4, 2014 decision, the ALJ found that the Cornerstone program could

provide S.T. with FAPE by providing a 41-week program plus bridge services. JA

II at 278, 283.  Upon receiving the Hearing Decision, HCPSS immediately notified

S.T.'s parents and the Trellis School that it would terminate funding for S.T.'s

placement effective close of business on March 7, 2014.

Appellants filed a civil complaint in the United States District Court for the

District of Maryland on March 10, 2014, challenging the ALJ's decision and again

invoked the IDEA's "stay-put" provision. JA I at 10-20. On June 23, 2014,

Appellees filed a motion for a preliminary injunction to terminate the stay-put. JA I

at 21-31.  On September 25, 2014, the district court denied Appellees' motion for

---

[4] Ms. Majoros was identified as the autism specialist for HCPSS.

[5] Ms. Zimmerman was identified an Instructional Specialist for HCPSS.

preliminary injunction to transfer S.T. to the Cornerstone program. JA I at 44-57.[6]

The parties thereafter filed cross motions for summary judgment. JA I at 59.

(Plaintiffs' Motion ) and JA I at 58 (Defendants' Motion). On January 5, 2015, the

district court entered an order granting the Appellees' motion for summary

judgment and denying the Appellants' motion for summary judgment.  JA I at 74-

84.  Appellants noted their appeal of the district court order on January 6, 2015. JA

I at 85.

## SUMMARY OF ARGUMENTS

The IDEA requires school systems like HCPSS to provide a free appropriate

education (FAPE) to children with disabilities.  The individualized education

program (IEP) is the primary vehicle by which a FAPE is provided.  The IEP

identifies, *inter alia,* the special education and related services the child will

receive, the duration of those services, and the educational placement in which the

services will be provided.

The IEP developed by the Appellees, Howard County Public School System

(HCPSS) for S.T. in October, 2013, identified an educational placement that could

not implement S.T.'s IEP.  Therefore, the IEP did not offer S.T. a FAPE at the time

it was created.  The ALJ and district court erred in relying on retrospective

_____

[6] HCPSS continued to fund S.T.'s placement at Trellis –Hunt Valley until
January 5, 2015, when the district court entered its final Order on the merits.

8

evidence of proposed changes to the educational placement to determine that HCPSS had offered S.T. a FAPE.  Changing the educational placement after the IEP has been developed significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of FAPE. Finally, the ALJ and district court erred in holding that the Appellees had not yet denied S.T. a FAPE.

## ARGUMENTS

### A. STANDARD OF REVIEW

This Court has held that whether a party is entitled to summary judgment as a matter of law is reviewed *de novo.  Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th, Cir. 1997) *citing Higgins v. E.I. DuPont de Nemours& Co.,* 863F.2d 1162, 1167 (4th Cir. 1988).  "IDEA actions are original actions that should typically be disposed of by motions for judgment."  *Kirkpatrick v. Lenoir County Bd. of Edu.*, 216 F.3d 380, 385, n.4 (4th Cir. 2000).  In the instant case, the parties filed cross motions for summary judgment with the district court granting the Appellees' motion and denying the Appellants' motion.  Whether an IEP is sufficient to provide a free appropriate public education is a question of fact which is reviewed for clear error. *See County Bd. of Henrico v. ZP ex rel. RP*, 300 F.3d 298, 309 (4th Cir. 2005), *see also DiBuo ex rel. DiBuo v. Board of Edu.*, 309 F.3d

184, 188 n.8 (4th Cir. 2002). However, a district court's interpretation of the IDEA is reviewed *de novo*. *Wagner v. Bd. of Edu. of Montgomery Co.*, 355 F.3d 297, 301 (4th Cir. 2003).  *See also ZP* at 309 *quoting Consolidated Coal Co. v. Local 1643, United Mine Workers of Am.*,48 F.3d 125, 128 (4th Cir, 1995). ("[T]he clearly erroneous rule does not protect findings made on the basis of the application of incorrect legal standards.").

## B. IT IS A DENIAL OF FAPE FOR A SCHOOL SYSTEM TO OFFER AN EDUCATIONAL PLACEMENT THAT CANNOT IMPLEMENT THE IEP AT THE TIME THE IEP IS WRITTEN.

The IDEA requires states and local education agencies to ensure that "all children with disabilities" receive a "free appropriate public education" (FAPE). *See* 20 U.S.C. §1412(a)(1)(A).  FAPE is defined by the statute as

> special education and related services that . . .(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State education agency; (C) include an appropriate … education…, and (D) are provided in conformity with the individualized education program (IEP)."

20 U.S.C. § 1401(9).

The IEP is the primary vehicle through which a FAPE is delivered. *Schaffer v. Weast,*546 U.S. 49, 53 (2005), *see also Burlington Sch. Committee v. Mass. Dept. of Edu.*, 471 U.S. 359, 368 (1985)("The modus operandi of the Act is the…'individualized educational program."); *A.K. ex rel. J.K. v. Alexandria City*

10

*School,* 484 F.3d 672, 675 (4th Cir.2007)("A school provides a FAPE by creating an IEP.")

The statute and its implementing regulations also provide a detailed list of requirements that a valid IEP must contain. *See* 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320.  Included in the list is the requirement that the IEP identify the location and duration of the services and modifications specified in the IEP. 20 U.S.C. § 1414(d)(1)(A)(i)(VII); § 300.320(a)(7).  An IEP that has been designed in accordance with the Act must identify an educational placement that can implement the IEP. *See A.K.,* 484 F.3d at 680. ("In light of the fact that the school at which special education services are expected to be provided can determine the appropriateness of an education plan, it stands to reason that it can be a critical element for the IEP to address.").

It is undisputed that the October 21, 2013 IEP, developed by HCPSS for S.T., required 46 weeks of special education and related services. *See* JA II at 201-207, 220.  HCPSS approved the entire IEP including 46 weeks of services.  It is undisputed that the Cornerstone program, at the time of the creation of the IEP on October 21, 2013, followed the regular HCPSS school calendar which was 36 weeks. JA II at 383, ¶ 14-24 (testimony of I.T.)  Yet, the IEP meeting concluded without any discussion of how Cornerstone would implement an IEP that required

11

46 weeks of special education and related services.[7]    It is axiomatic that a

program that operates only 36 weeks cannot implement an IEP that requires 46

weeks of services.  Thus, the Cornerstone program, could not implement the IEP at

the time it was approved by HCPSS, which constitutes a substantive denial of

FAPE.  S*ee A.K.*, 484 F. 3d 681*quoting Glendale Unified Sch. Dist. v. Almasi*, 122

F. Supp. 2d 1093,1108 (C.D.Cal. 2000) ("it is incumbent on the school district to

utilize its expertise to 'clearly identify an *appropriate* placement.'") (emphasis

added);  *DC ex rel. EB v. New York City Dept. of Educ.*, 950 F. Supp. 2d 494, 509

(S.D.N.Y. 2013) (holding that a school system that proposes an educational

placement that cannot implement the IEP "has by definition failed to deliver a

FAPE").  Therefore, the ALJ and the district court erred as a matter of law in

holding that Cornerstone could provide S.T. a FAPE.

---

[7] There was testimony at the due process hearing that the IEP team found
S.T eligible for "extended school year" (ESY) services, JA II at 301 ¶ 9-16
(testimony of Josselyn Ensor), but the IEP states that the decision regarding ESY
was "deferred." JA II at 208.  Even if the IEP team approved ESY, there was no
discussion of what services S.T. would have received; or the frequency, duration,
intensity, or location of the services. JA II at 302  ¶ 3-18(testimony of Josselyn
Ensor).  *See* discussion on ESY services, *infra.*

## C. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN CONSIDERING RETROSPECTIVE EVIDENCE REGARDING THE EDUCATIONAL PLACEMENT OFFERED TO S.T.

In *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470 (4th Cir. 2009), this

Court cautioned against giving weight to evidence that did not exist at the time the

IEP was created.

> Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calculated to enable the child to receive educational benefits.' But this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created.

*Id.* at 477 (internal citations omitted); *accord Roland M. v. Concord Sch. Comm.*,

910 F.2d 983, 992 (1st Cir. 1990)("An IEP is a snapshot, not a retrospective.");

*accord Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3rd Cir.

1993)("the measure and adequacy of an IEP can only be determined as of the time

it is offered to the student, and not at some later date . . . . Neither the statute nor

reason countenance 'Monday Morning Quarterbacking' in evaluating the

appropriateness of a child's placement"); s*ee also Adams v. Oregon,* 195 F.3d

1141, 1149 (9th Cir.1999) (holding that a reviewing court should examine the

adequacy of an IEP as of the time the IEP was drafted.)

Judicial review of whether a school district has offered a FAPE "generally

must limit its consideration to the terms of the IEP itself."  *A.K.* 484 F.3d at 682

13

(citations omitted).  This Circuit has particularly restricted the analysis of the

placement offered by the school system. Such an evaluation, this court has held,

should not include "a comment made during the IEP development process" that is

not captured in the IEP document. *See AK,* 484 F.3d at 682. "Expanding the scope

of a district's offer" in that way would "undermine" the above policies. *See id.*   In

*Avjian v. Weast*, 242 Fed. Appx. 77 at *81; 48 IDELR 61, at *270 (4th Cir.2007)

(*unpublished)* this Court reaffirmed that courts should "reject the . . . invitation that

we ignore the plain terms of the written IEP."  Thus, it is a matter of settled law in

this Circuit that the appropriateness of an IEP and proposed placement should be

evaluated as they appeared in the written IEP on the day that the IEP was approved

by the school system. That analysis should not be based on comments made by

school system personnel that were not included in the IEP or subsequent changes

in information and facts.

The undisputed evidence shows that the Cornerstone program was a 36-

week program at the time the IEP was developed, and continued to be a 36 week

program through the first month of the due process hearing.  Ashley Grant,[8] the

Cornerstone classroom teacher, JA II at 341, testified on the first day of the

hearing, January 9, 2014, that the Cornerstone program was 36 weeks in length. JA

---

[8] Ashley Grant was called by the Appellants as an adverse witness.

14

II at 295 ¶ 9-16. Not until February 4, 2014, the fourth day of the hearing and after the parents had concluded the presentation of their case, was there testimony that Cornerstone had become a 41 week program. JA II at 355 ¶ 11-12(testimony of Shannon Majoros)("The Cornerstone program has been determined to be an 11-month program.").[9]

It was an error of law for the ALJ and the district court to consider new evidence on the fourth day of the due process hearing that was not available when the IEP was developed. The appropriateness of the IEP and placement must be determined as of the time it was created. *See Schaffer*, 554 F.3d at 477. However, the district court erred further in ruling that the prohibition on this type of retrospective evidence applied only to the adequacy of the IEP and not to the appropriateness of the educational placement. JA I at 81-82. This Court has noted that identification on the IEP of the school in which the special education and related services will be provided is a "critical element for the IEP to address" because the school can determine the appropriateness of the IEP. *See supra, also A.K.* 484 F. 3d at 680. The Cornerstone program is identified on the IEP, as required by law, making it a necessary component of the IEP. JA II at 222. Thus,

---

[9] Although no witness testified that Cornerstone was a 41-week program, the ALJ determined that it was 41 weeks based on the testimony of Ms. Majoros, JA II at 355 ¶ 22-23, and Ms. Zimmerman, JA II at 368 ¶ 22-23, that five weeks had been added to the 36-week Cornerstone program.

15

the district court's distinction of the educational placement as separate from the IEP is inapposite and legal error. It is contrary to controlling case law, the spirit of the IDEA, and fundamental principles of equity and fairness to allow a school system to revise its placement offer months after the IEP was developed and during the course of an adversarial proceeding. Further, because the school system has control over the Cornerstone program, it created new evidence about the program after the parents had completed the presentation of their case. There is a fundamental inequity in allowing the school system to manipulate the evidence in this manner after the parents, who have the burden of proof, have presented their case.

### D. PARENTAL INVOLVEMENT IN THE IEP PROCESS IS ABROGATED IF THE SCHOOL SYSTEM IS PERMITTED TO CHANGE THE EDUCATIONAL PROGRAM AFTER THE IEP HAS BEEN CREATED.

The development of an IEP is intended to be a collaborative process between the parents of the child and school personnel. *See Burlington Sch. Comm. v. Mass. Dept. of Edu.* 471 U.S. 359, 368 (1985). To allow a school system to alter the educational program during the course of a due process hearing from what was offered when the IEP was created also defeats another important goal of the Act; parental involvement in the development of the IEP. Parental participation throughout the IEP process is an important requirement of the IDEA. *See Schaffer*

16

*v. Weast* 546 U.S. at 53 ("Parents and guardians play a significant role in the IEP process."); *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256, 259 (4th Cir. 1988) (the spirit and intent of the IDEA emphasize parent involvement); *see also W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23,* 960 F.2d 1479, 1485 (9th Cir. 1992)("in order to fulfill the role of parental participation in the IEP process, the school district [is] required to conduct, not just an IEP meeting, but a meaningful IEP meeting."); *Deal v. Hamilton Bounty Bd. of Edu.,* 392 F.3d 840, 859 (6th Cir. 2004)(holding that the school district denied the student a FAPE when it deprived the parents of an opportunity to meaningfully participate in the development of the IEP.) When Congress reauthorized the IDEA in 2004, it found that "the education of children with disabilities can be made more effective by… strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home." 20 U.S.C. §1400(c)(5)(B) (2006).  The IDEA specifically notes that it constitutes a denial of FAPE if the parents' opportunity to participate in the decision-making process regarding the provision of FAPE is "significantly impeded."  20 U.S.C. §1415(f)(3)(E)(ii)(II).

This Court has held that limiting judicial review of whether a school district has offered a FAPE to the terms of the IEP itself, supports "the important policies served by the requirement of a formal written offer," which are (1) "'creating a

17

clear record of the educational placement and other services offered to the

parents'" and (2) "'assist[ing] parents in presenting complaints with respect to any

matter relating to the educational placement of the child.'" *A.K.* 484 F.3d at 682.

(citations omitted). The United States Court of Appeals for the Second Circuit has

noted:

> In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision. At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents. . .

*RE v. New York City Dept. of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012).

The Supreme Court has noted that "[s]chool districts have a natural

advantage in information and expertise." *Schaffer 546 U.S.* at 60. Thus, they

should be held accountable for the educational program they offer parents at the

time the IEP is created. Clearly school districts have more comprehensive

knowledge of the scope of their own resources and educational placements than do

parents. When parents accept or reject an educational placement, they do so in

reliance on the information the school system has provided them about the

proposed placement. If the school system is permitted to change the educational

placement that was offered at the IEP meeting to another program without parental

input, any input the parents may have had in the decision-making process is rendered meaningless.

In the case at bar, HCPSS excluded S.T.'s parents from the decision-making process. Although both parties knew at the time the IEP was developed that the proposed placement at Cornerstone could not implement the IEP, HCPSS ignored the parents' concerns. At the due process hearing, HCPSS argued that the Parents' complaint was premature because the school system had not yet denied S.T. a FAPE. *See infra.* Such an argument is disingenuous and inconsistent with the IDEA's emphasis on parent involvement in the decision-making process. §1415(f)(3)(E)(ii)(II). HCPSS' argument requires parents to place their child in the placement offered by the school system which they believe is inappropriate. If the parents are right, and the new placement turns out to be inappropriate, the child will have lost valuable educational opportunity as well as, possibly, an opportunity to return to the former appropriate placement. In *V.S. v. New York City Dept. of Educ.*, 25 F. Supp. 3d 295 (E.D. N.Y., 2014), the district court considered a similar fact pattern and reversed the Impartial Hearing Officer and State Review Officer's decisions noting that "[u]nder the defendant's view, a parent must agree to the [school system's] recommended school site knowing that it is inappropriate, enroll her child in that school, and then wait and see if the student will actually be

19

assigned to an appropriate school site." The court held that school system's argument was "antithetical" to the IDEA. *Id.* at 300.

The Supreme Court has noted that there is an expectation of good faith on the part of both parties in the IEP process. *See Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2503 (2009); *see also Burlington Sch. Comm. v. Mass. Dept. of Edu.* 471 U.S. 359, 374 (1985) (noting that "equitable considerations are relevant in fashioning relief."). A school system acts in bad faith when it knowingly offers a program that cannot implement the IEP and the intended collaborative effort between parents and school personnel is thus abrogated.

### E. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY INCLUDING BRIDGE SERVICES IN ITS DETERMINATION THAT APPELLEES HAD OFFERED S.T. A FAPE.

In *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012), the Second Circuit held that "[t]estimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." The ALJ and the district court erred in considering the testimony of HCPSS witnesses regarding "bridge services." On the fourth day of the due process hearing, HCPSS, for the first time mentioned "bridge services." For the reasons discussed, *supra*, regarding retrospective evidence, "bridge services" should not be considered in the determination of the appropriateness of

20

the placement offered S.T. on October 21, 2013. "Bridge services" are not ever mentioned in the IEP. As this court held in *A.K.* and the Second Circuit held in *R.E.*, judicial review of whether a school district has offered a FAPE should be limited to the terms of the IEP. *A.K.* at 682; *R.E.* at 186 ("retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered."). As bridge services are not mentioned anywhere in the IEP, it was an error of law for the ALJ and district court to consider them in deciding whether the educational placement could provide S.T. a FAPE.

Even if such evidence were relevant to a determination of Cornerstone's ability to implement the IEP, there was no evidence adduced at the hearing that 41 weeks plus "bridge services" would satisfy the 46 weeks of special education and speech and language therapy and occupational therapy required in the IEP because there was no evidence that explained anything about "bridge services." The only evidence related to "bridge services" came from the testimony of Janet Zimmerman, on the fourth day of the hearing, when she testified

> we also in Howard County have the option if children need it when we make those individual ESY decisions of providing something we have commonly called lately bridge services. If a child needs a little something more or different between the end of an ESY program and the start of school, we can customize an individualized services *[sic]* a child might need to bridge even more.

21

JA II at 368-369 ¶ 25-7.  It is noteworthy that during the hearing, which took five days, a significant volume of evidence was admitted that included over 100 documents, eleven witnesses, and over 1300 pages of transcript, the only reference to "bridge services" contained in all that evidence is the testimony of Ms. Zimmerman, quoted above.  Further, Ms. Zimmerman did not testify that HCPSS **would** provide "bridge services" to S.T.; rather she testified it was an "option **if** children need it."  *Id.* (emphasis added).  She did not testify how it is decided whether a child needs bridges services or what the bridge services would be. She did not testify that the bridge services would be provided for an additional five weeks nor how many days per week or hours per day would be provided. She did not testify that the bridge services would implement S.T.'s October 21, 2013 IEP, or provide any of the services identified on S.T.'s IEP.  Bridge services were never more than a hypothetical construct developed during the due process hearing in an attempt to satisfy the requirements of the IEP.  "Since the hearing officer must evaluate the IEP as it existed, and not a hypothetical IEP that never existed, the officer erred as a matter of law." *See Jenna R.P. v. City of Chicago Sch. Dist. No. 229,* 3NE 3d 927, 940 (Ill. App. 1st Div. 2013) *citing A.K.* 484 F. 3d 672, 682 *and R.E.,*694 F.3d 167, 185-86.  So the ALJ and the district court erred in relying on bridge services in their calculation to hold that Cornerstone could provide S.T. a FAPE, as their finding is not supported by the evidence.  Further, as the parents

have the burden of proof, they were required to offer proof regarding something that was not in the IEP, never mentioned prior to the fourth day of the due process hearing, and was only a hypothetical.  *See* JA II at 278 (Hearing Decision)("[T]he Cornerstone program will run at least 41 weeks (36 weeks with five weeks of ESY) with the **possibility** of bridge services to make up the 46 weeks.")(emphasis added).  Principles of equity and fairness and law demand that bridge services not be considered in the determination of whether HCPSS offered S.T. a FAPE.

Because the IEP is the vehicle by which a FAPE is delivered, bridge services would have to be identified in the IEP if they are an element integral to the provision of a FAPE. *See Schaffer v. Weast,* 546 U.S. at 53.  The ALJ and district court approved an IEP that lacked the services which both determined were essential to the provision of a FAPE to S.T., *see* JA II at 278 (Hearing decision) and JA I at 80-81 (District Court decision), which constitutes legal error.  Thus, in holding that a 41-week program plus "the possibility of bridge services" could provide S.T. a FAPE, the ALJ and the district court approved an IEP that did not exist, which constitutes an error of law.

**F.  THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT THE APPELLEES HAD NOT YET FAILED TO PROVIDE S.T. A FAPE.**

The ALJ and district court erred in holding that the parents had not proven their case because HCPSS had not yet denied S.T. a FAPE.  JA II at 278 (Hearing decision )("[I]t is premature to find that HCPS *[sic]* failed to implement the IEP as written.  The Parents cannot show, prospectively, that the HCPS *[sic]* failed to implement the IEP.")   In so holding the ALJ ignored the facts and the law.  The district court upheld the ALJ's decision finding that her "credibility determinations" were "sound" and Plaintiffs had not proven that her methodology warranted reversal of her decision. JA I at 83 (District Court decision).  But, the Appellants' argument, then and now, was not about the ALJ's credibility determinations or her methodology.  Rather, the argument is about the ALJ's and district court's erroneous application of the law.

1.  **The holding that the Appellants' due process complaint was premature ignores the Parents' right to challenge the educational placement identified by the IEP team.**

The IDEA provides the parents of a child with a disability a panoply of procedural safeguards including the right to challenge the educational placement identified by the IEP team.  20 U.S.C. § 1415(b)(6).  S.T.'s due process complaint, and the subject of this proceeding, challenges the Cornerstone 36-week program identified by the IEP team, not the Cornerstone 41-week program plus bridge

24

services suggested months later at the due process hearing. As noted *supra*, the adequacy of an IEP, including the proposed educational placement, must be reviewed in the context of the information available to the parties at the time of the creation of the IEP. *See Schaffer* 554 F.3d at 477. The IDEA does not require the parents of a child with a disability to delay their challenge of what they believe to be an inappropriate placement and wait to see whether the school system will offer an appropriate program at a later time. Yet, that is the argument advanced by HCPSS and upheld by the ALJ and the district court. Thus, the Appellants' due process complaint was not premature and the ALJ and the district court erred as a matter of law in finding that it was.

> **2. The holding that the Appellants' due process complaint was premature denies parents the right to rely on the school system's description of the proposed educational placement.**

In *Reyes v. New York City Dept. of Educ.*, 760 F.3d 211 (2nd Cir. 2014), the parent was faced with an analogous dilemma. Her child's IEP called for three months of a 1:1 paraprofessional when she believed he needed 1:1 support for the entire school year. *Id.* During the due process hearing, a school system witness testified that the IEP could be modified to extend the paraprofessional to a full school year. *Id.* at 217. The court noted

> [a]t the time when she had to decide where to place R.P., Reyes could not know whether [the Department of Education] would offer R.P. the services of a paraprofessional for more than the three months specified in the IEP.

25

> We therefore think it contrary to the logic of *R.E.*[*v. New York City Dept. of Educ.*, 694 F.3d 167, (2d Cir. 2012)]*,* and of the IDEA itself, to penalize her for relying upon the IEP's description of services in making the placement decision.

*Id.* at 220-221. The Court went on to state "[w]e think it inappropriate, [] to take into account the possibility of mid-year amendments in determining whether an IEP as originally formulated was substantively adequate." *Id.* at 221.

In the same manner, S.T.'s parents could not know whether HCPSS would provide S.T. the 46 weeks of special education and related services specified on S.T.'s IEP at the Cornerstone program. Just as in *Reyes*, the Appellants should not be penalized for relying on the Appellees' description of Cornerstone as a 36-week program and challenging that placement decision when they did.

3. **The holding that the Appellants' due process complaint was premature denies the Parents the right to maintain S.T. at his current educational placement.**

The IDEA also provides parents the right to maintain their child in his "then-current educational placement" during the pendency of the proceedings. 20 U.S.C. §1415(j). This "stay-put" provision of the Act only activates upon the filing of a due process complaint and attaches to the educational placement the child is in at the time of the filing. *Id.* If S.T.'s parents had not filed their due process complaint until after S.T. had transferred to Cornerstone, they would have lost this valuable right. The IDEA does not require parents to sacrifice one right to

preserve another. *See Burlington Sch. Comm.v. Department of Educ.*471 U.S. 359,

370 (1985)("If that were the case, the child's right to a free appropriate public

education, the parents' right to participate fully in developing a proper IEP, and all

the procedural safeguards would be less than complete.")  A finding that the

Parents' due process complaint was premature usurps an important right

guaranteed by the IDEA to parents.  Therefore, the ALJ and district court erred as a

matter of law in holding that the Appellants' due process complaint was premature.

**4.  Holding an IEP meeting at a later time to discuss extended school year services does not cure the deficiencies in the identified educational placement.**

HCPSS also argued that the Parents' due process complaint was premature

because an IEP meeting to discuss extended school year services (ESY) could be

held in the spring to modify the IEP. JA II at 339  ¶ 8-15 (opening statement of

Appellees' counsel) and JA II at 384-85 ¶24-6 (closing statement of Appellees'

counsel). This, of course, would be after S.T. had transferred to Cornerstone. Thus,

HCPSS argues that even if the placement identified on the IEP could not provide

FAPE, as long as the school year had not ended, the parents were required to

accept the new placement.  But as noted, *supra,* the IDEA does not require parents

to delay filing a due process complaint to challenge an inappropriate educational

placement.

An IEP meeting to discuss ESY would not have cured the deficiency in the placement at Cornerstone. Extended school year means special education and related services provided beyond the normal school year. *See* 34 C.F.R. § 300.106(b). The IEP team determines whether the student is eligible for ESY and the amount of special education instruction and related services the student will receive. *Id.* at § 300.106(a). Thus, the purpose of an ESY IEP meeting would be, as the name implies, to develop an IEP to provide ESY services during the summer if the student is found eligible. *See* COMAR 13A.05.01.09A(2). However, S.T.'s IEP calls for 46 weeks (12 months) of full implementation of the IEP, so an ESY IEP was not necessary. *See Reusch v. Fountain*, 872 F. Supp. 1421, 1436 (D. Md. 1994) (Students with 46- week, year-long IEPs do not need ESY services "because the length of the existing programs would make such a determination immaterial.") S.T.'s difficulty with transitions and need for consistency of programming was a reason his IEP required continuous services year-round rather than a 36-week program plus ESY. JA II at 326 ¶ 9-24 (testimony of Tara Wagner[10]) and JA II at 302-302A ¶ 25-22 and JA II 303-304 ¶ 1-23(testimony of Josselyn Ensor[11]).

---

[10] Ms. Wagner was identified as Director of Trellis Educational Services.

[11] Ms. Ensor was identified as the Education Director at Trellis School.

The IEP team had already determined that S.T. required full implementation of his IEP for 46 weeks, throughout the school year.  Josselyn Ensor testified that all services and hours of service at Trellis remain the same during the summer as the regular school year.  JA II at 304-304A  ¶ 20-21  ESY services were not at issue because ESY services are only needed for students who have 36-week IEPs. *See Reusch. See also* JA II at 320 ¶ 3-8(testimony of Tara Wagner)("we determined that he was eligible; however, we didn't make a statement because he is currently in a 12-month program and ESY is not applicable.").  No new information had been presented that S.T.'s needs had changed.  The Appellees sought an ESY IEP meeting and revision of the IEP solely because their preference for a placement had changed. Thus, the IEP would have been changed from 46 weeks to 36 weeks  with ESY for the purpose of fitting the IEP to Cornerstone, but not S.T.'s educational needs.

A 12-month IEP is significantly different from a 10-month program with ESY.  *See Reusch.*  Extended school year services are not intended to be a continuation of the total IEP provided during the regular school year; not intended to teach new skills, or to increase progress on instructional objectives; not required to be provided all day, every day, or each day during the normal school break; and not an automatic program provision from year to year.  *See* MARYLAND STATE DEPARTMENT OF EDUCATION, TECHNICAL ASSISTANCE BULLETIN No. 5,

29

*Extended School Year Services* (*Revised July, 2003*). JA I at 66.  In *Reusch*, the court found that a year round program and a 10-month program with ESY are not the same and termed the school system's claim that they were, a "gimmick." *Id.* at 1436.

At the due process hearing, S.T.'s mother testified that the ESY programs S.T. had attended previously were significantly different than the regular school year including shorter days, a four-day week some years, different related service providers with fewer hours of services, and a different school.  JA II at 328-330 ¶ 5-17.  She testified further that she had been told by an HCPSS representative that the ESY program at Cornerstone for the 2014 summer would be four days per week, four hours per day, and last just four weeks.  JA II at 330-31 ¶ 18-5.

By agreeing with the Appellees' argument, the ALJ and district court endorsed the position that an IEP can be revised to fit the placement. The IEP is supposed to be individualized to the needs of the student with the resulting placement determined by the IEP, not the other way around. 34 C.F.R. §300.116(b)(2). The Appellees' argument requires parents to acquiesce to an inappropriate placement that cannot implement the IEP and then wait for the school system to revise the IEP to fit the placement before the parents are allowed to challenge the placement. The Appellees' argument distorts the law and, in fact, turns the IDEA on its head. *See Justin G. v. Bd. of Edu. Of Montgomery Co.*, 148

F. Supp. 2d 576, 587 (D. Md 2001)("MCPS's disturbing interpretation would also place parents of such children in the untenable position of acquiescing to an inappropriate placement in order to preserve their right to reimbursement. The Supreme Court has expressly rejected saddling parents of disabled children with such a pyrrhic victory.").  Thus, the ALJ and the district court erred as a matter of law in holding that the parents had not proven that HCPSS had not yet failed to provide S.T. a free appropriate public education.

## **CONCLUSION**

It undermines the spirit and intent of the IDEA, and the parent participation in the IEP process envisioned by Congress is rendered a fiction, if a school system is allowed to force the parents of a child with a disability to accept an educational placement that, at the time of the IEP's creation, cannot implement the IEP, because the school system intends to modify the placement at a later time, or as in the instant case, change the IEP to fit the educational placement. Nothing in the statute, the regulations, or the case law supports such a process.  Equitable considerations militate against permitting a school system from changing the educational program it offered at the IEP meeting to a different type of educational program during the course of the Due Process Hearing or introducing evidence that was not available at the time the IEP was created and after the parents have

31

presented their case. It was legal error for the ALJ and the district court to consider testimony of services not included in the IEP in an attempt to cure the deficiencies in S.T.'s IEP.

WHEREFORE, Appellants respectfully request that this Honorable Court REVERSE the holding of the District Court and enter an Order finding that the Appellees failed to offer S.T. a free appropriate public education and Order the Appellees to maintain S.T.'s placement at the Trellis School in Hunt Valley.

## REQUEST FOR ORAL ARGUMENT

Appellants request that this case be scheduled for oral argument.

Respectfully submitted,

_____/s/_____
Wayne Steedman
Callegary & Steedman, P.A.
201 N. Charles Street, Suite 1402
Baltimore, Maryland 21201
410-576-7606

James Silver
Callegary & Steedman, P.A.
201 N. Charles Street, Suite 1402
Baltimore, Maryland 21201
410-576-7606

Counsel For Appellants

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 7,833 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32

(a)(5) and the type style requirements of  Fed. R. App. P. 32(a)(6) because

this brief has been prepared using a proportionally spaced typeface using

Microsoft Word  in 14-point, Times New Roman font.

                                    _____/s/_____
                                    Wayne Steedman
                                    James Silver
                                    Callegary & Steedman, P.A.
                                    201 N. Charles Street, Suite 1402
                                    Baltimore, Maryland 21201
                                    410-576-7606
                                    Counsel for Appellants

## **CERTIFICATE OF SERVICE**

I have this 8th day of April, 2015, filed the required copies of the foregoing Opening Brief of Appellants and Joint Appendix with the Clerk of the Court via hand delivery and electronically using the CM/ECF system which will send notification of such filing  to opposing counsel as follows:

Jeffrey A. Krew
JEFFREY A. KREW, LLC
9713 Rugby Court, Suite 100
Ellicott City, MD 21042
(301) 621-4900
jkrew@krewlaw.com

Counsel for Appellee


                                              _____/s/_____
                                              Wayne Steedman
                                              James Silver
                                              Callegary & Steedman, P.A.
                                              201 N. Charles Street, Suite 1402
                                              Baltimore, Maryland 21201
                                              410-576-7606

                                              Counsel for Appellants